UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------

UNITED STATES OF AMERICA,


                    – against –                          **MEMORANDUM & ORDER**
                                                         23-CR-24 (MKB)


SHAKEEM RANKIN,


                                  Defendant.

--------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

        Defendant Shakeem Rankin is charged in a three-count indictment with two separate

counts of violating 18 U.S.C. § 2252(a)(2) and (b)(1) and one count of violating 18 U.S.C.

§ 2252(a)(4)(B) and (b)(2).  (Indictment ¶¶ 1–3, Docket Entry No. 1.)  On December 8, 2023,

Rankin moved to suppress (1) all evidence identified as the fruit of a search of Rankin's home on

March 16, 2022, and (2) Rankin's statements made to law enforcement during the search.[1]

(Def.'s Mem. 1.)  On February 21, 2024, the Court held an evidentiary hearing.  (Min. Entry

dated Feb. 21, 2024.)  At the hearing, the Court heard testimony from Federal Bureau of

Investigations ("FBI") Special Agents Angela Tassone and Amanda Young, reviewed an audio

recording of Rankin's interview with law enforcement on March 16, 2022, viewed photographs

of Rankin's home taken on March 16, 2022, and reviewed the metadata from the photographs

and other documents related to the execution of the search warrant on that date.  (*Id.*; Exhibit List

dated Feb. 21, 2024, Docket Entry No. 24.)  Rankin and his mother submitted affidavits attesting

---

[1] (Def.'s Mot. to Suppress ("Def.'s Mot."), Docket Entry No. 15; Def.'s Mem. in Supp.
of Def.'s Mot. ("Def.'s Mem."), Docket Entry No. 15-1; Gov't Opp'n to Def.'s Mot. ("Gov't
Opp'n"), Docket Entry No. 16; Def.'s Reply in Supp. of Def.'s Mot. ("Def.'s Reply"), Docket
Entry No. 17.)

to various facts, but did not testify at the February 21, 2024 hearing.[2]  The parties submitted additional briefing following the hearing.[3]

For the reasons discussed below, the Court denies Rankin's motion to suppress.

## I. Background

### a. Search Warrant

On March 15, 2022, based on evidence resulting from an FBI investigation, Magistrate Judge James R. Cho issued a search warrant for Rankin's residence and person, to be executed between the hours of 6:00 AM and 10:00 PM on or before March 29, 2022 (the "Search Warrant").  (Search Warrant 58, annexed to Gov't Opp'n as Ex. 1, Docket Entry No. 16.)[4]

### b. Execution of the Search Warrant

The parties' accounts differ as to the time and manner in which the Search Warrant was executed.  Rankin asserts that (1) FBI agents banged on his front door at about 5:05 AM on March 16, 2022, (2) two agents took him to one of the rear bedrooms where one officer sat in a chair in the room and another officer stood by the door of the room, blocking the exit, and (3) the

---

[2] (Aff. of Shakeem Rankin ("Def.'s Aff."), annexed to Def.'s Mot. as Ex. D, Docket Entry No. 15-6; Aff. of Jem Hazle Rankin ("Jem Rankin Aff."), annexed to Def.'s Mot. as Ex. E, Docket Entry No. 15-7.)

[3] (Gov't Suppl. Ltr. in Opp'n to Def.'s Mot. ("Gov't Suppl. Ltr."), Docket Entry No. 25; Def.'s Suppl. Ltr. in Supp. of Def.'s Mot. ("Def.'s Suppl. Ltr."), Docket Entry No. 26.)  The government moved to file an additional letter in response to Rankin's Supplemental Letter, to which Rankin objected.  (Gov't Reply Ltr. in Opp'n to Def.'s Suppl. Ltr. ("Gov't Suppl. Reply Ltr."), Docket Entry No. 27; Def.'s Reply Ltr. in Supp. of Def.'s Mot. ("Def.'s Suppl. Reply Ltr."), Docket Entry No. 28.)  The Court grants the government's motion and considers the government's reply letter.

[4] Because the internal pagination for Exhibit 1 to the government's opposition is inconsistent, the Court refers to the page numbers assigned by the electronic case filing system.

search was executed for a duration of over two hours.  (Def.'s Mem. 4; *see also* Def.'s Aff. 1–2; Jem Rankin Aff. ¶¶ 7, 10–11.)

The government asserts that (1) law enforcement entered Rankin's residence at approximately 6:10 AM, (2) the two special agents who interviewed Rankin were seated in chairs across from Rankin and the door to exit the bedroom was never obstructed to prevent Rankin from leaving, and (3) the search took approximately one hour.  (Gov't Opp'n 3–5, 8.)

    **c.  Rankin's statements**

During the search, Special Agents Tassone and Aaron Spivack interviewed Rankin and recorded the conversation.  (Gov't Opp'n 5–7 & 5 n.7; Mar. 16, 2022 Interview Tr. ("Interview Tr.") 1, annexed to Def.'s Mot. as Ex. C, Docket Entry No. 15-5.)  At the beginning of the interview, the special agents introduced themselves and then Special Agent Spivack stated:

> So we do apologize for how we came in this morning.  Again, we, we — this is how, uh, we have to do things.  We have to secure everything first.  Make sure everything's okay for everybody.  And then we can explain to you guys what's going on.  Nobody's under arrest.  Uh, this is just a search warrant. . . . [W]e are just here on a search warrant.  So your alarm, I think, on your phone went off a minute ago.  So if there's anywhere you need to go, you're, you're welcome to.  You're free to.

(Interview Tr. 1.)  Special Agent Spivack later had the following exchanges with Rankin during the interview:

> [SPIVACK]:  [B]efore we get too far, . . . you understand, like, you know, do you have anywhere to be today?
>
> [RANKIN]:  Um, work.
>
> [SPIVACK]:  This morning?  Okay.  I just want to make sure that you understand that you can leave.  What time do you have to go to work?  You're not in your head.[5] Do you understand?

---

[5] In context, the Court understands this to mean "you're nodding your head."

[RANKIN]:    Um, I have to be at work at 8:30, but I usually get up around this time.

. . .

[SPIVACK]:    Um, are you cool with talking to us for a little bit? We can s-sort this stuff out, or, uh, do you need to get out of here?

[RANKIN]:    I mean, I need to get to work at—by 8:30.

[SPIVACK]:    Okay.

[RANKIN]:    So I usually leave here like 7:00.

[SPIVACK]:    All right.  If we talk for a few minutes, is that okay?

[RANKIN]:    Yeah, I'd rather not, but—

[SPIVACK]:    Well, you don't have to.  I mean, we, we just wanna obviously go through this and obviously kind of let you know what we're doing here, what we're taking.  We obviously have some questions.

[RANKIN]:    Wait you ha—you haven't told me what you're doing here yet, though.  I don't understand.

[SPIVACK]:    Well, that's what we're getting into, but I want to make sure that you're okay.  You're—'cause you're not under arrest.  I wanna make sure you understand that.  Do you understand that?

[RANKIN]:    Yeah.  But what was the problem, though?  I don't understand.

(*Id.* at 1–2.)

### d.   Motion to suppress

On December 8, 2023, Rankin moved to suppress (1) all evidence identified as the fruit of the search of Rankin's home, and (2) Rankin's statements made to law enforcement during the search.  (Def.'s Mem. 1.)  Rankin contends that the warrant was improperly executed before 6:00 AM, and therefore the search of his home was unlawful.  (*Id.* at 5–9.)  Rankin also argues that his statements to Special Agents Tassone and Spivack were made while he was subject to custodial interrogation, and therefore should be suppressed because he was not provided with *Miranda* warnings in advance of giving the statements.  (*Id.* at 10–12.)

4

### e.   Affidavits submitted by Rankin and his mother

In support of his motion, Rankin submitted affidavits from himself and his mother. (Def.'s Aff.; Jem Rankin Aff.)  Rankin and his mother both asserted in their affidavits that the search warrant was executed just after 5:00 AM, and that the search, including Rankin's interview, took two hours.  (Def.'s Aff. 1–2; Jem Rankin Aff. ¶¶ 7, 11.)  Rankin's affidavit further stated that two of the officers in the home brought him to "the back bedroom" in his house, and during the interview, "[t]he female officer was sitting by the bed on a chair, and the male officer was standing by the door.  Basically so [Rankin] couldn't leave."  (Def.'s Aff. 1–2.) He also asserts that during the interview, "[a]nother officer took [his] phone to another room to go through it" and later returned.  (*Id.* at 2.)

### f.   Evidentiary hearing

On February 21, 2024, the Court held an evidentiary hearing and heard testimony from Special Agents Tassone and Young, reviewed documentary evidence, and also heard arguments from the parties.  (Min. Entry dated Feb. 21, 2024; Exhibit List dated Feb. 21, 2024, Docket Entry No. 24.)

#### i.   Special Agent Tassone's and Young's testimonies

##### 1.   Execution of the search

Special Agent Tassone, the case agent for Rankin's case, testified that on March 16, 2022, the team executing the search warrant planned to, and did, meet at 5:30 AM in the parking lot of a Dollar Tree store near Rankin's home.  At approximately 6:00 or 6:05 AM on that date, the team left the parking lot, traveled less than five minutes to Rankin's residence, and arrived there at approximately 6:10 AM, at which time they initiated the search.  During her testimony, Special Agent Tassone reviewed several documents submitted into evidence, including the crime scene

sign-in log.  (*See* Crime Scene Sign-In Log, Gov't Ex. 32.)  She testified that she signed the

crime scene sign-in log, that the "time in" listed on the log was 6:10 AM, and that it was

consistent with her memory of when the team entered the Rankin residence on March 16, 2022.

Special Agent Tassone also testified regarding the twenty-four photographs taken during

the execution of the search.  (Gov't Exs. 1–25, 30.)  The metadata provided for the photographs

indicates that they were taken between 5:16 AM and 6:20 AM, beginning approximately one

hour before the government asserts the search was initiated at 6:10 AM.  (Gov't Ex. 30.)  Special

Agent Tassone testified that the metadata for the photographs taken during the search warrant are

not consistent with when the search was executed because the camera used to take the

photographs had not been updated to reflect daylight saving time.  In support of this testimony,

she reviewed photographs taken the day of the search and submitted into evidence at the hearing,

as well as a chart showing the metadata for each of the photographs, also submitted into

evidence.  (*See* Gov't Exs. 15, 20, 30.)  She testified that she had reviewed the chart and

confirmed that the time indicated in the metadata chart matched those of the photographs.  She

also testified that daylight saving time that year began the Sunday before the search,[6] that she

had not adjusted the date or time setting on the camera used to take photographs during the

search, and that sunrise on March 16, 2022 was at 7:05 AM.  When reviewing photographs taken

the day of the search, she confirmed that in a photograph of one of the bedrooms in the Rankin

residence, a clock shows the time as approximately 7:10 AM, but the metadata for that

photograph indicated that it was taken at 6:10 AM.  (*See* Gov't Exs. 15, 30.)  She similarly

testified that in a photograph of the dining room of the Rankin residence, a clock shows the time

---

[6]  During her testimony, Special Agent Tassone confirmed that the date for the execution
of the search warrant listed on the operations order form was Wednesday, March 16, 2022.
(Operations Order Form 1, Gov't Ex. 27.)

as approximately 6:15 AM, although the metadata for the photograph indicates that it was taken at 6:11 AM.  (*See* Gov't Exs. 20, 30.)

Special Agent Tassone also reviewed two photographs taken of the front door to Rankin's residence, as well as the metadata associated with them.  (Gov't Exs. 2, 24, 30.)  She testified that the first of these two photos, an entry photograph of the door to Rankin's residence, taken when it was dark outside, was consistent with her recollection of how the front door appeared when she entered the home at approximately 6:10 AM on March 16, 2022, but that the metadata stated it was taken at 5:16 AM.  (Gov't Exs. 2, 30.)  The exit photograph of the same door, taken when it was light outside, was similarly consistent with her recollection of how the front door appeared when she exited the residence, which she believed was at approximately 7:15 AM, but the metadata stated it was taken at 6:20 AM.  (Gov't Exs. 24, 30.)

Special Agent Young, the search team leader for the search of Rankin's home, reviewed documentation related to the search during her testimony, including the search warrant execution log.  (Search Warrant Execution Log, Gov't Ex. 31.)  She confirmed that she had signed the search warrant execution log, that she had written 6:10 AM as the time the search was executed, and that she would have confirmed that time by looking at her watch at the time she entered the residence, consistent with her usual practice.

### 2.    Interview of Rankin

Special Agent Tassone also testified that during the search, she and Special Agent Spivack took Rankin to a bedroom in the back of the house to question him.  At the hearing, the Court heard portions of the audio recording of the interview, and Special Agent Tassone confirmed that Special Agent Spivack stated in the recording that the interview began at 6:16 AM and ended at 7:08 AM, consistent with standard practice.  She testified further that the

interview began approximately five minutes after the agents entered the residence and lasted approximately fifty minutes.  She also testified that Rankin at no point asked to leave the interview and the door of the bedroom was partially open during the interview.  During the interview, Rankin was seated on the edge of the bed, and both Special Agent Tassone and Special Agent Spivack were seated in chairs.  At some point during the interview, another agent on the search team came to the door and asked Special Agent Spivack to step outside to assist with one of the cell phones that the search team had located.  Special Agent Spivack stepped outside for one to two minutes, during which time another member of the search team stepped into the room.

        **ii.    Additional evidence**

At the hearing, the Court heard portions of the audio recording of Rankin's interview on March 16, 2022, viewed photographs of Rankin's home taken on March 16, 2022, and reviewed the metadata from the photographs and other documents related to the execution of the search warrant on that date.  (*See* Min. Entry dated Feb. 21, 2024; Exhibit List dated Feb. 21, 2024, Docket Entry No. 24.)  The Court separately reviewed the entirety of the audio recording of Rankin's interview, which was submitted into evidence at the hearing, (Mar. 16, 2022 Audio Recording, Gov't Ex. 26), and reviewed the transcript of the recording, which was submitted with Rankin's moving papers, (Interview Tr.).

On the audio recording of Rankin's interview with law enforcement, Special Agent Spivack noted that the interview began at 6:16 AM, and at the end of the recording, he noted that it concluded at 7:08 AM.  (*See* Mar. 16, 2022 Audio Recording at 00:00–00:11, 51:50–51:57, Gov't Ex. 26.)  The metadata indicates that an entry photograph of the door to Rankin's residence, taken when it was dark outside, was taken at 5:16 AM, and that the exit photograph of

the same door, taken when it was light outside, was taken at 6:20 AM.[7]  (Gov't Exs. 2, 24, 30.)
The metadata also indicates that twenty-four photographs were taken between 5:16 AM and 6:20
AM.  (Gov't Ex. 30.)  Two of the photographs show two separate rooms of Rankin's home with
clocks indicating times different from the times listed in the metadata of those photographs.[8]
(*See, e.g.*, Gov't Exs. 15, 20, 30.)  Several of the documents created at the time of the search also
indicated that the search team entered the residence at approximately 6:10 AM.  (*See, e.g.*,
Search Warrant Execution Log, Gov't Ex. 31; Crime Scene Sign-In Log, Gov't Ex. 32.)  Finally,
the government requested that the Court take judicial notice of two facts: (1) that in 2022,
daylight saving time began on March 13, 2022; and (2) on March 16, 2022, sunrise occurred at
7:05 AM.[9]  (*See Daylight Saving Time*, U.S. Navy Astronomical Applications Dep't, Gov't Ex.

---

[7]  The government also submitted evidence that the sun rose at 7:05 AM on the day the
search was executed.  (*See Table of Sunrise/Sunset, Moonrise/Moonset, or Twilight Times for an
Entire Year*, U.S. Navy Astronomical Applications Dep't, Gov't Ex. 34 (stating that sunrise on
March 16, 2022 was at 6:05 AM UTC, and that the reader should "[a]dd one hour for daylight
time, if and when in use"); *Daylight Savings Time*, U.S. Navy Astronomical Applications Dep't,
Gov't Ex. 33 (stating that in 2022, daylight saving time began March 13, 2022).)

[8]  One of the clocks, shown in a photograph of a bedroom, shows a time one hour later
than the time indicated in the metadata.  (*See* Gov't Exs. 15, 30.)  The other clock, shown in a
photograph of the dining room, shows a time only approximately five minutes later than the time
indicated in the metadata.  (*See* Gov't Exs. 20, 30.)  The government argues that this evidence
suggests that the clock in the bedroom had been adjusted for daylight saving time, but the clock
in the dining room had not, and that this may explain why Rankin's mother, who was seated in
the living room with a view of the dining room clock, would have seen 5:15 AM on the clock
when it was actually 6:15 AM.

[9]  The Court is permitted to, and does, take judicial notice of these two facts.  *See, e.g.*,
Fed. R. Evid. 201 (permitting a court to "judicially notice a fact that is not subject to reasonable
dispute" because it "(1) is generally known within the trial court's territorial jurisdiction; or
(2) can be accurately and readily determined from sources whose accuracy cannot reasonably be
questioned"); *United States v. Michael*, 664 F. App'x 32, 35–36 (2d Cir. 2016) (affirming the
district court's decision to take judicial notice of the relationship between UTC and EST as well
as the impact of daylight saving time on UTC); *United States v. Robinson*, No. 16-CR-545, 2019
WL 1211431, at *7 (E.D.N.Y. Feb. 27, 2019), *report and recommendation adopted by 2019 WL*

33; *Table of Sunrise/Sunset, Moonrise/Moonset, or Twilight Times for an Entire Year*, U.S. Navy

Astronomical Applications Dep't, Gov't Ex. 34.)

## II.   Discussion

### a.   Standards of review

#### i.   Search warrant execution

"On a motion to suppress, the defendant bears the initial burden of establishing that a

government official acting without a warrant subjected him to a search or seizure," *United States*

*v. Davis*, 111 F. Supp. 3d 323, 331 (E.D.N.Y. 2015) (quoting *United States v. Herron*, 18 F.

Supp. 3d 214, 221 (E.D.N.Y. 2014)), and that the defendant "had a reasonable expectation of

privacy in the place or object searched," *United States v. Delva*, 858 F.3d 135, 148 (2d Cir.

2017).  Once the defendant has shown a basis for his motion, the burden shifts to the government

to demonstrate by a preponderance of the evidence that the search or seizure did not violate the

Fourth Amendment.  *Id.* (collecting cases); *see also United States v. Chandler*, 164 F. Supp. 3d

368, 376 (E.D.N.Y. 2016) ("[O]nce the [d]efendant shows that the [g]overnment official was

acting without a warrant, 'the government has the burden of showing that the search was valid

because it fell within one of the exceptions to the warrant requirement' of the Fourth

Amendment." (quoting *United States v. Perea*, 986 F.2d 633, 639 (2d Cir. 1993))); *United States*

*v. Wyche*, 307 F. Supp. 2d 453, 457 (E.D.N.Y. 2004) ("On a motion to suppress evidence in a

criminal trial, once [the defendant] establishes a basis for his motion, the burden rests upon the

[g]overment to prove, by a preponderance of the evidence, the legality of the actions of its

officers.").

---

1206723 (E.D.N.Y. Mar. 14, 2019) (taking judicial notice of sunrise and sunset based on the
government's submission of the U.S. Naval Observatory records).

"The execution of a search warrant is reviewed for reasonableness." *United States v. Joyce*, No. 22-3020, 2024 WL 1194367, at *1 (2d Cir. Mar. 20, 2024) (citing *United States v. Ramirez*, 523 U.S. 65, 71 (1998)). Searches pursuant to a warrant must be conducted (1) consistent with the terms of the warrant and (2) in a reasonable manner. *See United States v. Ganias*, 824 F.3d 199, 209–10 (2d Cir. 2016) ("[B]oth the scope of a seizure permitted by warrant, and the reasonableness of government conduct in executing a valid warrant, can present Fourth Amendment issues."); *United States v. Messalas*, No. 17-CR-339, 2020 WL 4003604, at *8 (E.D.N.Y. July 14, 2020) ("[S]earches pursuant to a warrant must be conducted consistent with the terms of the warrant and in a reasonable manner."). A search warrant must be "execute[d] . . . during the daytime, unless the judge for good cause expressly authorizes execution at another time." Fed. R. Crim. P. 41(e)(2)(A)(ii); *see also United States v. Skyfield*, No. 23-CR-569, 2023 WL 8879291, at *11 (S.D.N.Y. Dec. 22, 2023) ("Rule 41 provides that a 'warrant to search for and seize a person or property' must command law enforcement officers to 'execute the warrant during the daytime, unless the judge for good cause expressly authorizes execution at another time.'" (quoting Fed R. Crim. P. 41(e)(2)(A)(ii))); *Messalas*, 2020 WL 4003604, at *8 (same). "Daytime is defined as 'the hours between 6:00 [AM] and 10:00 [PM] according to local time.'" *Skyfield*, 2023 WL 8879291, at *11 (quoting Fed. R. Crim. P. 41(a)(2)(B)).

### ii.   Custodial interrogation

"In *Miranda v. Arizona*, the Supreme Court held that the 'in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.'" *Georgison v. Donelli*, 588 F.3d 145, 154 (2d Cir. 2009) (quoting

11

*Miranda v. Arizona*, 384 U.S. 436, 467 (1966)); *see also Maryland v. Shatzer*, 559 U.S. 98, 103 (2010) ("In *Miranda v. Arizona*, the Court adopted a set of prophylactic measures to protect a suspect's Fifth Amendment right from the 'inherently compelling pressures' of custodial interrogation." (citations omitted)).  As a procedural safeguard, the Supreme Court established the now-familiar *Miranda* warnings, which it believed necessary "to secure the privilege against self-incrimination."  *Donelli*, 588 F.3d at 154 (quoting *Colorado v. Spring*, 479 U.S. 564, 572 (1987)).  "The purpose of the *Miranda* warning is to ensure that the person in custody has sufficient knowledge of his or her constitutional rights relating to the interrogation and that any waiver of such rights is knowing, intelligent, and voluntary."  *United States v. Murphy*, 703 F.3d 182, 192 (2d Cir. 2012) (quoting *United States v. Carter*, 489 F.3d 528, 534 (2d Cir. 2007)).  However, "[a]n interaction between law enforcement officials and an individual generally triggers *Miranda*'s prophylactic warnings [only] when the interaction becomes a 'custodial interrogation.'"  *United States v. Vinas*, 910 F.3d 52, 60 (2d Cir. 2018) (quoting *United States v. FNU LNU*, 653 F.3d 144, 148 (2d Cir. 2011)); *Donelli*, 588 F.3d at 155 ("*Miranda*'s warning requirements, however, apply only to 'custodial interrogation.'" (quoting *United States v. Newton*, 369 F.3d 659, 669 (2d Cir. 2004))).

Determining custodial interrogation involves "two parts: (a) there must be an interrogation of the defendant, and (b) it must be while [the defendant] is in 'custody.'"  *FNU LNU*, 653 F.3d at 148 (citing *Cruz v. Miller*, 255 F.3d 77, 80–81 (2d Cir. 2001)).  "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response."  *Acosta v. Artuz*, 575 F.3d 177, 189 (2d Cir. 2009) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301

(1980)).  "[T]he overarching 'custody' question is whether 'a reasonable [person] in the suspect's position would have understood' h[im]self to be 'subjected to restraints comparable to those associated with a formal arrest.'"  *FNU LNU*, 653 F.3d at 153 (alterations in original) (quoting *Donelli*, 588 F.3d at 155); *see also Mara v. Rilling*, 921 F.3d 48, 70 (2d Cir. 2019) ("A person is seized within the meaning of the Fourth Amendment if, under the totality of the circumstances, a reasonable person would have believed that he was not free to leave." (citing *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988))).

    **b.**   **The Court denies Rankin's motion to suppress**

The Court denies Rankin's motion to suppress.  The Court finds that (1) the warrant was properly executed between the hours of 6:00 AM and 10:00 PM, and (2) Rankin was not in custody when he gave his statement to the special agents and therefore the agents were not required to provide him with *Miranda* warnings.

        **i.**   **The warrant was properly executed**

Rankin argues that the FBI conducted an unauthorized search because the FBI executed the search at approximately 5:05 AM, but the search warrant only authorized a search between the hours of 6:00 AM and 10:00 PM.  (Def.'s Mem. 4, 7–9.)

The government argues that the search warrant was executed at approximately 6:10 AM and in a "proper and reasonable manner," and therefore was conducted according to the parameters of the warrant.  (Gov't Opp'n 10–14.)

Based on the testimony and evidence presented at the hearing, the Court finds the testimony of Special Agents Tassone and Young to be credible.  The special agents provided consistent testimony about when the search team arrived and departed from Rankin's home, and their testimony was further supported by the documentary evidence, indicating that the search

team entered the home at approximately 6:10 AM.[10]  (*See, e.g.*, Search Warrant Execution Log, Gov't Ex. 31; Crime Scene Sign-In Log, Gov't Ex. 32.)

Although the metadata of the photographs indicate that the photographs were taken between 5:16 AM and 6:20 AM on the day of the search, (*see* Gov't Ex. 30), several of the photographs support the government's assertion that the camera had not been adjusted for daylight saving time in advance of the search.  For example, two photographs indicate that a clock in one of the bedrooms was showing a time one hour later than the time shown in the photograph's metadata, (*see* Gov't Exs. 15, 30), but the clock in the dining room, in view of where Rankin's mother was located during the search, showed a time only a few minutes later than the time indicated in the metadata for that photograph, (*see* Gov't Exs. 20, 30).  Thus, one clock indicated the time adjusted for daylight saving time and the other did not.  In addition, the metadata of the exit photograph of the front door to Rankin's residence taken when it was light outside indicates it was taken at 6:20 AM.  (Gov't Exs. 24, 30.)  However, the evidence demonstrates that the sun rose on March 16, 2022 at 7:05 AM, which supports the conclusion that the metadata indicating the time the photograph was taken did not account for daylight saving time.  Finally, the government also submitted evidence that daylight saving time went into effect on March 13, 2022, three days before the search, and that Special Agent Tassone did not adjust the date or time settings of the camera prior to the search.

---

[10]  During the evidentiary hearing, Rankin challenged the credibility of several of the documents related to the search based on what he asserted were inconsistencies, such as Special Agent Tassone's failure to initial the crime scene sign-in log even though she signed it and a blank date line in the search warrant execution log.  The Court finds the documents to be corroborative of the government's argument that the search warrant was executed after 6:00 AM on March 16, 2022.  *See, e.g.*, *Messalas*, 2020 WL 4003604, at *2 (concluding that the testimony of FBI witnesses was credible where they "provided testimony that was logical, internally consistent, consistent with one another, and substantially corroborated by contemporaneous documentary evidence").

Based on the evidence, the Court finds that the government has proven by a preponderance that the search warrant was properly executed after 6:00 AM and prior to 10:00 PM.  The Court therefore denies Rankin's motion to suppress evidence found as a result of the search.

### ii.  Rankin was not in custody

Rankin argues that he was in custody when he spoke with and made the relevant statements to Special Agents Tassone and Spivack, and therefore because he was not provided with *Miranda* warnings, any statements made during that conversation and any evidence obtained from his consent to cede control of his online accounts should be suppressed.  (Def.'s Mem. 10–12.)  Rankin argues that a reasonable person in his position would have believed that they were not free to leave, because the agents (1) entered by employing a battering ram to wake up the individuals in the house rather than merely knocking on the door and detained his family at gunpoint while searching the house, (2) maneuvered him to a private room for a three-on-one interrogation, and (3) persisted in questioning him when he stated he would "rather not" answer their questions at that time, after having already seized his phone.  (Def.'s Reply 8–9.)

The government argues that Rankin was not in custody such that *Miranda* warnings were required because (1) he was in his home during the questioning and (2) was told multiple times that he was free to leave and not under arrest.  (Gov't Opp'n 14–19.)

"The free-to-leave inquiry constitutes a necessary, but not determinative, first step in establishing *Miranda* custody."  *Newton*, 369 F.3d at 670; *see also FNU LNU*, 653 F.3d at 153. The "ultimate inquiry" for determining *Miranda* custody is whether a reasonable person in the defendant's position would have considered himself subject to a restraint on freedom of the degree associated with formal arrest.  *See Newton*, 369 F.3d at 670 (quoting *California v.*

*Beheler*, 463 U.S. 1121, 1125 (1983)); *Mara*, 921 F.3d at 70 ("A person is seized within the meaning of the Fourth Amendment if, under the totality of the circumstances, a reasonable person would have believed that he was not free to leave.").  In assessing whether a defendant was in "custody," courts examine the totality of the circumstances, including "the interrogation's duration; its location (*e.g.*, at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; [and] whether officers told the suspect he was free to leave or under suspicion."  *FNU LNU*, 653 F.3d at 153 (citations omitted); *United States v. Broughton*, 600 F. App'x 780, 782–83 (2d Cir. 2015) (noting that to determine whether a suspect is in "custody" for the purposes of *Miranda*, a court must examine the totality of the circumstances and determine whether, given those circumstances, a reasonable person would have felt "at liberty to terminate the interrogation and leave" (quoting *United States v. Badmus*, 325 F.3d 133, 138 (2d Cir. 2003) (per curiam))).  Informing a suspect that he is not under arrest is a "significant factor" in determining the custodial nature of an interview.  *Newton*, 369 F.3d at 677; *see also United States v. Faux*, 828 F.3d 130, 138 (2d Cir. 2016) ("[A] reasonable person told . . . that he was not under arrest would likely have understood that he was not about to be removed from his home to the police station — a significant factor in assessing the degree to which one is at 'the mercy' of the authorities." (alteration in original) (quoting *Newton*, 369 F.3d at 677)).

The totality of the circumstances indicate that Rankin was not in custody and was therefore not subjected to custodial interrogation.  The duration of the conversation was approximately one hour long, it took place at Rankin's home, Rankin was not physically

restrained during the interview, and no weapons were drawn during the interview.[11]  *See, e.g.,*
*Faux*, 828 F.3d at 135–36 (noting that "courts rarely conclude, absent a formal arrest, that a
suspect questioned in her own home is 'in custody,'" and concluding that the defendant was not
in custody where, among other things, she was questioned in her home, not handcuffed, and the
agents did not display their weapons or otherwise threaten or use any physical force); *United
States v. Familetti*, 878 F.3d 53, 60 (2d Cir. 2017) ("[A]bsent an arrest, interrogation in the
familiar surroundings of one's own home is generally not deemed custodial." (alteration in
original) (quoting *Newton*, 369 F.3d at 675)).  The special agents also repeatedly told Rankin
during his interview that he was not under arrest and could leave at any time.  *See, e.g.,* *Badmus*,
325 F.3d at 139 (concluding that given "in particular" the district court's "finding that the agents
informed the defendant and his wife that they were not under arrest and could ask the agents to
leave at any time," a reasonable person would have understood that he was not in custody).
Rankin therefore was not in custody.  *United States v. Gabriel*, No. 21-CR-152, 2023 WL

---

[11]  Rankin also asserts, and the government disputes, that there was a special agent
standing at or blocking the door to Rankin's bedroom during his interview.  (Def.'s Aff. 1–2.)  In
support of this argument, Rankin points to the photograph of the bedroom in which he was
questioned, which shows only one chair in the room.  (*See* Gov't Ex. 13.)  Special Agent
Tassone, however, testified that before the photograph was taken the second chair was moved
back to where it was originally taken from, because it was not in the room before the interview
took place.  Based on the testimony provided at the evidentiary hearing, and the Court's finding
as to the credibility of the witnesses presented at the hearing, the Court finds that Rankin was not
physically blocked from leaving his bedroom during the conversation.  Even if he were,
however, this would be insufficient to establish that he was physically restrained such that he
was subject to custodial interrogation.  *See, e.g., Faux*, 828 F.3d at 135 (concluding that the
defendant was not in custody even though she "was not permitted to move freely about her home
during the two-hour interrogation" and "agents accompanied her to the bathroom and to her
bedroom to fetch a sweater" and that "[a]lthough she was not permitted to go from room to room
without being accompanied, she was not completely at the mercy of the police" (internal
quotation marks omitted)); *United States v. Bershchansky*, 958 F. Supp. 2d 354, 383 (E.D.N.Y.
2013) ("Even the use of handcuffs prior to an interrogation . . . does not automatically render the
interrogation custodial."), *aff'd*, 788 F.3d 102 (2d Cir. 2015).

2412178, at *6 (E.D.N.Y. Feb. 9, 2023) ("Where questioning takes place in the suspect's home, the conversation is cooperative, the suspect is told they are not under arrest and can ask to leave at any time, a non-custodial holding will generally follow." (citing *Familetti*, 878 F.3d at 60)), *report and recommendation adopted by* 2023 WL 2403628 (E.D.N.Y. Mar. 8, 2023); *United States v. Mastroianni*, No. 20-CR-575, 2022 WL 17404783, at *6 (S.D.N.Y. Dec. 2, 2022) ("A reasonable person in [the d]efendant's situation would not feel restricted to a degree comparable to a formal arrest, especially where the individual was in their own home, not handcuffed or otherwise physically restrained, and repeatedly told they were not under arrest and were free to leave.").

In support of his argument that a reasonable person would not have believed he was free to leave, Rankin emphasized (1) the agents' brandishing of their weapons upon entering the home, (Def.'s Mem. 11), and (2) his statement during his interview with Special Agents Tassone and Spivack that he would "rather not" speak with them, (*id.*, Def.'s Reply 8–9; Interview Tr. 2). These circumstances are insufficient, however, to establish that Rankin was in custody.  First, no weapons were drawn during the interview.  Indeed, Special Agent Tassone testified as such and Rankin confirmed in his affidavit that the special agents' weapons were not drawn at that time. (*See* Def.'s Aff. 1 (noting that when the special agents brought Rankin to the back bedroom their guns were holstered).)  In addition, at the beginning of Rankin's conversation with the agents they apologized for "how [they] came in" and explained to him that they had to "secure everything first" and "[m]ake sure everything's okay for everybody."  (Interview Tr. 1.)  A defendant's "initial restraints cannot establish a state of custody for the duration of his interactions with the police."  *Familetti*, 878 F.3d at 61 (concluding that the defendant was not in custody during his interrogation, because although the defendant had been handcuffed when the

18

agents first entered his home, he was not handcuffed during the interrogation in his bedroom); *see also United States v. Simmonds*, 641 F. App'x 99, 102 (2d Cir. 2016) ("Although the use of firearms is generally an important factor in our analysis of the totality of the circumstances, the fact that the officers initially used firearms and briefly searched [the defendant] does not compel a conclusion that the ensuing interrogation was custodial, especially where the use of firearms was 'necessitated by the officers' safety concerns' and ended 'as soon as . . . the perceived security threat abated.'" (quoting *United States v. Cota*, 953 F.2d 753, 759 (2d Cir. 1992))); *United States v. Clark*, 600 F. Supp. 3d 251, 268 (W.D.N.Y. 2022) (concluding the defendant was not in custody during her interview with law enforcement even though when the SWAT team entered her home the "SWAT team members had long guns drawn and [the d]efendant was handcuffed").

Second, although Rankin points to the fact that he stated that he would "rather not" speak with the agents to support his argument, in response to that statement the agent stated, "[w]ell, you don't have to . . . . We obviously have some questions," after which Rankin continued to converse with the agents.  (Interview Tr. 2.)  There is thus no indication that Rankin affirmatively tried to end the conversation and was not permitted to do so.

**III.  Conclusion**

Based on the record before the Court and the totality of the circumstances, the Court finds that law enforcement properly executed the search warrant for Rankin's home on March 16, 2022, and that Rankin was not in custody and therefore was not subject to custodial interrogation

during his March 16, 2022 interview by Special Agents Tassone and Spivack.  The Court

therefore denies Rankin's motion to suppress.

Dated:  April 8, 2024
         Brooklyn, New York

                              SO ORDERED:


                              _____s/ MKB_____
                              MARGO K. BRODIE
                              United States District Judge