UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------
UNITED STATES OF AMERICA,

– against –

SHAKEEM RANKIN,

                    Defendant.
-----------------------------------------------------------------

**MEMORANDUM & ORDER**
23-CR-24 (MKB)

MARGO K. BRODIE, United States District Judge:

    Defendant Shakeem Rankin was charged in a three-count indictment with two separate counts of violating 18 U.S.C. § 2252(a)(2) and one count of violating 18 U.S.C. § 2252(a)(4)(B). (Indictment ¶¶ 1–3, Docket Entry No. 1.) Trial commenced on June 17, 2024, and the government rested its case on June 18, 2024. (Trial Tr. 179:2, 498:5.)[1] At the close of the government's case, Rankin orally moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure, which the Court denied. (*Id.* at 499:3–501:13.) Following a three-day trial, the jury found Rankin guilty on all counts. (*Id.* at 680:18–681:3; Verdict Sheet, Ct. Ex. 1, Docket Entry No. 71.) Rankin then filed a written renewed motion for a judgment of acquittal on July 8, 2024, which the government opposed.[2]

---

[1] "Trial Tr." refers to the consecutively paginated trial transcripts dated June 17, 18, and 20, 2024. (*See* Trial Tr. 1–287, Docket Entry No. 75; Trial Tr. 288–533, Docket Entry No. 76; Trial Tr. 534–689, Docket Entry No. 77.)

[2] (Def.'s Mot. for Acquittal ("Def.'s Mot."), Docket Entry No. 74; Gov't Opp'n to Def.'s Mot. ("Gov't Opp'n"), Docket Entry No. 79; Def.'s Reply in Supp. of Def.'s Mot. ("Def.'s Reply"), Docket Entry No. 81.)

For the reasons discussed below, the Court denies Rankin's motion for a judgment of acquittal.

## I. Background

The Court assumes familiarity with the facts and procedural history as set forth in the Court's prior Memorandum and Order (the "April 2024 Decision"). (Mem. & Order dated Apr. 8, 2024 ("Apr. 2024 Decision"), Docket Entry No. 29.) The Court therefore summarizes only the relevant facts and procedural history.

### a. Factual background

On March 16, 2022, the Federal Bureau of Investigation ("FBI") executed a search warrant at Rankin's home. (Trial Tr. 339:15–19, 509:11–13.) During the search, two special agents, Angela Tassone and Aaron Spivack, interviewed Rankin. (Gov't Trial Exs. 502A–C; Trial Tr. 349:2–10.) Rankin confessed to having bought and sold child pornography, and, among other things, provided the agents with his information for his Kik, Cash App, and Telegram accounts. (Gov't Trial Exs. 502A–C; Trial Tr. 354:7–355:9.) The agents also seized several digital devices from Rankin's home. (Trial Tr. 345:17–24.)

### b. Motion to suppress

On December 8, 2023, Rankin moved to suppress (1) all evidence identified as the fruit of the search of Rankin's home, and (2) Rankin's statements made to law enforcement during the search. (Def.'s Mem. in Supp. of Def.'s Mot. to Suppress 1, Docket Entry No. 15-1.) After an evidentiary hearing, the Court denied Rankin's motion to suppress, and found that (1) the warrant was properly executed between the hours of 6:00 AM and 10:00 PM, and (2) Rankin was not in custody when he gave his statement to the special agents and therefore the agents were not required to provide him with *Miranda* warnings. (*See* Apr. 2024 Decision).

### c. Evidence at trial

At trial, the government presented evidence including (1) testimony regarding the circumstances of the search and Rankin's interview with Special Agents Tassone and Spivack, (*see* Trial Tr. 352:1–11, 511:23–512:7, 521:1–526:20, 573:2–581:12), (2) portions of the audio recording of Rankin's interview with Special Agents Tassone and Spivack, (*id.* at 352:12–15, 354:19–21, 355:7–9, 362:21–24, 363:5–11; *see also* Gov't Trial Exs. 502A–C), (3) testimony from Special Agent Tassone, (Trial Tr. 329:16–449:4), and (4) testimony from expert witness Anthony Imel, a photographic technologist and forensic examiner for digital imagery for the FBI, (*id.* at 466:24–488:15).

As relevant here, Special Agent Tassone testified that an iPhone 12 was retrieved from Rankin's home during the search, (*id.* at 348:5–13), that the iPhone 12 was checked into evidence by her in March of 2022, and that she did not check it out of evidence again until a few weeks prior to trial in June of 2024, (*id.* at 428:2–430:4). She also testified that the iPhone 12 was in her possession four times: (1) when it was seized in 2022 during the search of Rankin's residence, (*id.* at 428:8–429:4); (2) when she checked it out of evidence in advance of trial in 2024, (*id.* at 430:2–10, 431:10); (3) when it was provided to another agent for an additional search warrant and then given back to Special Agent Tassone, (*id.* at 431:10–13); and (4) when it was given to Agent Stepan Shkrobak, who then gave it back to Special Agent Tassone, (*id.* at 431:13–15). Special Agent Tassone also testified that Rankin agreed to speak with herself and Special Agent Spivack during the search of his home, (*id.* at 349:2–4), and when questioned on cross-examination whether she recalled that he "indicated that he did not wish to speak to [the agents]" she stated "[n]o, I don't recall," (*id.* at 435:17–436:2).

3

Portions of four videos and an image extracted from Rankin's devices containing child pornography, as well as an image collage compiling sixteen images from one of the video clips, were played for and shown to the jury. (*Id.* at 386:3–12, 386:22–387:14, 387:22–388:12, 478:8–479:6.) Imel testified regarding one of the videos and the image collage, and testified that in his opinion, there was no indication of modifications, manipulation, or tampering of the video, (*id.* at 476:21–477:10), and that the content in the collage was the same as the video, (*id.* at 480:2–6). On cross-examination, Imel testified that his report stated that the image collage was "100 percent authentic" and that the images "appear[ed] to be authentic." (*Id.* at 486:14–487:4.) In addition, he testified that there was "no difference in [his] mind" between "100 percent authentic" and "appear[s] to be authentic." (*Id.* at 487:6–10.) He also testified that he did not agree that "cropping was a manipulation of the image in the video," (*id.* at 487:17–25), but that cropping can "control what the viewer sees in a video" and that the cropping of the photos in the collage "did do that in this instance," (*id.* at 488:1–4).

### d.  Rule 29 Motion

At the close of the government's case, Rankin orally moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure, which the Court denied. (Trial Tr. 499:3–501:13.) The jury found Rankin guilty on all counts. (*Id.* at 680:18–681:3, Verdict Sheet.) On July 8, 2024, Rankin filed a written renewed motion for a judgment of acquittal, which the government opposed. (Def.'s Mot.; Gov't Opp'n.)

## II.  Discussion

### a.  Standard of review

Rule 29 provides, in relevant part, that:

> [a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment

4

> of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court may on its own consider whether the evidence is insufficient to sustain a conviction. If the court denies a motion for a judgment of acquittal at the close of the government's evidence, the defendant may offer evidence without having reserved the right to do so.

Fed. R. Crim. P. 29(a); *United States v. Pugh*, 945 F.3d 9, 19 (2d Cir. 2019). "[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be . . . to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979); *Pugh*, 945 F.3d at 19 ("The test for sufficiency . . . is whether a rational jury could conclude beyond a reasonable doubt that a defendant is guilty of the crime charged." (quoting *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008))).

In determining whether the evidence is sufficient, courts "'view the evidence presented in the light most favorable to the government[,]' and '[a]ll permissible inferences must be drawn in the government's favor.'" *United States v. Landesman*, 17 F.4th 298, 319 (2d Cir. 2021) (alterations in original) (quoting *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999)). Under this inquiry, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *United States v. Zhong*, 26 F.4th 536, 560 (2d Cir. 2022) ("A defendant . . . cannot prevail on a sufficiency-of-the-evidence challenge 'if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (quoting *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011))); *United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021) ("Only if 'the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt'

5

may the court enter a judgment of acquittal." (quoting *Guadagna*, 183 F.3d at 130)). "[I]t is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (citing *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995)).

### b. The Court denies Rankin's motion for a judgment of acquittal

Rankin argues that based on the evidence presented regarding the circumstances surrounding his interview with Special Agents Tassone and Spivack, no trier of fact could have concluded that his confession was voluntary. (Def.'s Mot. 5–8.) Rankin also contends that Special Agent Tassone and Imel provided inconsistent testimony, and therefore the jury was required to find them not credible and disregard both of their testimonies. (*Id.* at 11–14.) Rankin argues that in the absence of this evidence, the evidence presented at trial was insufficient to convict him. (*Id.* at 10, 12, 14.)

The government argues that Rankin is requesting that the Court substitute the jury's judgment of the witnesses' credibility with its own, because the jury heard and considered Rankin's arguments regarding the circumstances of the search and the credibility of the witnesses. (Gov't Opp'n 14–16.) The government also argues that there was sufficient evidence to find that Rankin's confession was voluntary, and that neither Special Agent Tassone nor Imel's testimonies were inconsistent. (*Id.* at 16–19.)

"Where there is conflicting testimony at trial, [the court] defer[s] to the jury's resolution of the witnesses' credibility." *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000) (quoting *United States v. Payton*, 159 F.3d 49, 56 (2d Cir. 1998)); *see also United States v. Jones*, 965 F.3d 190, 193 (2d Cir. 2020) (noting that a court is required to "resolve all issues of credibility in favor of the jury verdict" (quoting *United States v. Taylor*, 816 F.3d 12, 22 (2d Cir.

6

2016))); *United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011) (affirming the defendant's conviction because "'[i]t is the province of the jury and not of the court' to determine whether a witness who may have been 'inaccurate, contradictory and even untruthful in some respects' was nonetheless 'entirely credible in the essentials of his testimony'" (quoting *United States v. Tropiano*, 418 F.2d 1069, 1074 (2d Cir. 1969))); *United States v. Kissi*, No. 21-CR-64, 2022 WL 4103640, at *3 (S.D.N.Y. Sept. 8, 2022) ("Credibility determinations are 'the province of the jury and not of the court'" and therefore "courts must 'resolve all issues of credibility in favor of the jury verdict.'" (first quoting *O'Connor*, 650 F.3d at 855; and then quoting *Jones*, 965 F.3d at 193)).

### i. Rankin's confession

Rankin first argues that the statements made during his confession and any evidence resulting from that confession should have been disregarded by the jury because the confession was involuntary and coerced. (Def.'s Mot. 5.) Rankin argues that no rational trier of fact could have found that his confession was voluntary based on the evidence presented at trial regarding the circumstances surrounding the confession, and therefore the jury was required to disregard the confession as evidence in making its determination. (*Id.* at 6–7.) In support, Rankin points to evidence at trial that (1) the search of his home on March 16, 2022, "began with the Government's unreasonable, excessive use of a battering ram against the front door of the residence"; (2) six of the law enforcement officers who were present for the search were armed; (3) Rankin's father and brother were not permitted to enter the home during the search; (4) law enforcement "forced [Rankin's mother] and [Rankin] up against a wall" when they first entered the premises and would not allow them to move; (5) Rankin's mother was "forced to stay sitting on a couch for two hours," was not allowed to use the bathroom, and was forced to remain in her

7

pajamas during the search and not allowed to wear a robe; (6) during his interview, Rankin was "escorted to a back room for the interview where he was never left alone and there were always two members of law enforcement accompanying him"; and (7) Rankin "indicated to law enforcement that he did not wish to speak with them, yet they proceeded to interview him." (*Id.* at 7–8.) Rankin also argues that because the evidence could only support a conclusion that the confession was involuntary, any evidence obtained from the statements should have been disregarded by the jury as inadmissible fruit of the poisonous tree. (*Id.* at 9–10.) Rankin argues that this includes the evidence presented at trial that (1) Rankin confirmed during his interview that the iPhone 12 at issue, the "MulaDussa" Kik account, the Telegram account, phone number at issue, Cash App username, and Yahoo email account all belonged to him; (2) the government used this information to connect the iPhone and accounts allegedly used by Rankin to transmit and obtain the images and videos at issue; and (3) the content of any text messages regarding the distribution or purchase of the images and videos at issue. (*Id.* at 9.)

      The government argues that the evidence presented at trial indicates that Rankin's statements "were both knowingly and voluntarily made and were credible." (Gov't Opp'n 16.) In support, the government notes that (1) before speaking with the agents, Rankin was told that he was free to leave and was not under arrest; (2) Rankin decided to speak with the agents after receiving that information; (3) the "tone and tenor" of the interview demonstrated that Rankin's statements were voluntary; (4) Rankin's admissions about his control over the Kik account and other online accounts were corroborated by the business records obtained by FBI agents in St. Louis, which bolstered Rankin's credibility; and (5) Rankin's mother's experience during the search is irrelevant to whether Rankin's confession was coerced, because she was not present for his interview and was not aware that he was told he was free to leave. (*Id.* at 16–17.) The

8

government also argues that the case law Rankin cites regarding his fruit of the poisonous tree arguments relate to violations of the Fourth Amendment, which the Court concluded in its April 2024 Decision were not present during the search, and that regardless, Rankin's confession "merely corroborated the substantial independent evidence of [his] guilt for the charged crimes; it did not lead to unlawful 'fruits.'" (*Id.* at 16 n.3.)

Based on the evidence presented at trial, a reasonable juror could have concluded that Rankin's confession was voluntary. First, although Rankin points to testimony from his mother and his brother that they heard a loud banging on the door to their home and saw officers holding a battering ram, and that his mother observed damage on the door from a battering ram, (Def.'s Mot. 7; *see also* Trial Tr. 511:23–512:7 (Rankin's mother testifying about the banging on the door), 516:20–517:16 (Rankin's mother testifying that a photo showed damage from a battering ram to her front door), 573:5–576:25 (Rankin's brother testifying about the search)), the government also presented competing evidence that no battering ram was used when initiating the search, (*see, e.g.*, Trial Tr. 521:23–522:8 (Rankin's mother stating that she did not actually see officers using a battering ram), 524:6–526:5 (Rankin's mother stating that a photograph of the front door of the house from the day of the search did not show damage from a battering ram), 578:21–579:13 (Rankin's brother also stating he did not see a battering ram used on the door to the residence), 525:14–16 (Rankin's mother stating she believed the battering ram had been used on the front right quadrant of the front door), 580:17–581:3 (Rankin's brother stating the same), 583:16–584:14 (Detective Antonio Pagan testifying it is standard practice to bring a battering ram to a search, and that officers use an underhanded swing and aim for the locking mechanism of the door when using a battering ram)).

Second, Rankin points to several other circumstances that he argues indicate his confession was not voluntary, including that several of the law enforcement officers were armed, that they "forced [Rankin's mother] and [Rankin] up against a wall" upon entry, that there were two officers present at all times during Rankin's interview, and that Rankin stated that he would rather not speak with the officers at the beginning of his interview. (Def.'s Mot. 7–8.) The government presented competing evidence, however, in the form of portions of the audio tape of the interview, which indicates the interview was conversational in tone and showed that Rankin was told multiple times that he was free to leave and was not under arrest. (Trial Tr. 352:1–11; Gov't Trial Exs. 502A–C.) The audio showed that early in the interview, Rankin stated that he would "rather not" speak with Special Agents Spivack and Tassone, and Special Agent Spivack responded that Rankin did not have to speak with them. (Gov't Trial Ex. 502A.) The government also presented evidence regarding the usernames and customer information associated with the Kik, Cash App, and other accounts that corroborated information from Rankin's confession. (*See, e.g.*, Trial Tr. 358:1–361:8.)

There was therefore sufficient evidence presented such that, drawing the inferences in favor of the government, a rational trier of fact could have concluded that Rankin's confession was voluntary and found the confession credible, and the Court must defer to the jury's resolution of each witnesses' credibility. *See Autuori*, 212 F.3d at 118 ("Where there is conflicting testimony at trial, [the court] defer[s] to the jury's resolution of the witnesses' credibility." (quoting *Payton*, 159 F.3d at 56)).

    **ii. Special Agent Tassone's testimony**

Rankin argues that the Court should grant his motion for a judgment of acquittal because the jury was required to disregard Special Agent Tassone's testimony. (Def.'s Mot. 11.) In

10

support, Rankin argues that Special Agent Tassone made "several misrepresentations" during her testimony, rendering it unreliable. (*Id.*) Rankin points to Special Agent Tassone's testimony regarding the chain of custody of the iPhone 12 at issue, and argues that Special Agent Tassone's testimony was not credible because she initially testified that after the iPhone 12 was checked back into evidence in March of 2022, she did not take it out again until just a few weeks prior to trial, but she later testified the iPhone came into her custody four times after March of 2022. (*Id.*) Rankin argues that this indicates there were "overwhelming" defects in the government's chain of custody of the iPhone 12 such that "any reasonable juror would have disregarded the evidence as unreliable" and therefore the jury should have disregarded all evidence obtained from the 2024 extraction. (*Id.* at 12.) Finally, Rankin also argues that Special Agent Tassone's testimony was also not credible because she testified that Rankin "freely agreed to speak with law enforcement during the March 16, 2022 search of his home," but the audio recording of the interview on that date "revealed that [Rankin] stated he would rather not speak with [the officers], yet they proceeded to interview him." (*Id.*)

The government argues that Special Agent Tassone testified credibly. (Gov't Opp'n 17.) In support, the government argues that (1) Special Agent Tassone testified credibly about the chain of custody for the iPhone 12 because she explained that the iPhone 12 came into her custody four times, three of which occurred during the time the iPhone 12 was checked out of custody prior to trial in 2024; and (2) after Rankin said he would "rather not" speak with the agents during his interview, immediately thereafter Special Agent Spivack again advised Rankin that he did not have to speak with them. (*Id.* at 17–18.)

Special Agent Tassone testified that the iPhone 12 in question was in her possession four times: (1) when it was seized in 2022 during the search of Rankin's residence, (Trial Tr. 428:8–

11

429:4); (2) when she checked it out of evidence in advance of trial in 2024, (*id.* at 430:2–430:10, 431:10); (3) when it was provided to another agent for an additional search warrant and then given back to Special Agent Tassone, (*id.* at 431:10–13); and (4) when it was given to Agent Shkrobak, who then gave it back to Special Agent Tassone, (*id.* at 431:13–15). She also testified that the final three instances of it being in her possession all took place after she checked the iPhone 12 out of evidence the second time, several weeks before trial. (*Id.* at 448:3–24.) Special Agent Tassone also testified that Rankin willingly spoke with her and Special Agent Spivack during the search of his home, and when questioned on cross-examination whether she recalled that he "indicated that he did not wish to speak to [the agents]" she stated "[n]o, I don't recall." (*Id.* at 435:17–436:2.) The jury was also played the tape-recorded portion of Rankin's interview with the agents during which he stated that he would "rather not" speak with them, and Agent Spivack responded "[w]ell, you don't have to." (*See id.* at 618:18–25; Gov't Trial Exs. 502A–C.) Finally, defense counsel also argued to the jury that Special Agent Tassone was not a credible witness. (Trial Tr. 618:4–21, 622:5–12.)

Based on the evidence presented, a rational juror could conclude that Special Agent Tassone (1) checked the iPhone 12 out of evidence twice, and that the second time, it was given to two separate agents and returned to her, resulting in the iPhone 12 being in her possession four times, and (2) did not recall whether Rankin stated that he would rather not speak with the agents. "It is the province of the jury and not of the court" to determine whether a witness who may have been contradictory or inconsistent in their testimony was "nonetheless entirely credible in the essentials of his testimony," and therefore even if Special Agent Tassone's testimony was contradictory, the Court cannot supplant the jury's credibility determinations with its own. *O'Connor*, 650 F.3d at 855 (internal quotation marks and citation omitted) (concluding that the

12

defendant's "contentions that her convictions should be reversed on the grounds that [the witnesses'] testimony was not credible or was contrary to testimony of other witnesses . . . provide[d] no basis for reversal"); *see also Kissi*, 2022 WL 4103640, at *3 (denying the defendant's Rule 29 motion based on the credibility of a witness who contradicted himself during his testimony, because "[c]redibility determinations are 'the province of the jury and not of the court'" and therefore "courts must 'resolve all issues of credibility in favor of the jury verdict'" (first quoting *O'Connor*, 650 F.3d at 855; and then quoting *Jones*, 965 F.3d at 193)).

### iii. Imel's testimony

Rankin also argues that the jury should have disregarded the testimony of Imel, the government's expert witness, because the testimony was "untruthful." (Def.'s Mot. 13.) Rankin points to Imel's testimony at trial regarding whether two of the videos at issue in the case were authentic, and argues that Imel's report stated only that "the images [taken from the videos] appeared to be authentic," then at trial Imel testified both that the images were "100 percent authentic" yet on cross-examination stated only that the images "appear[ed] to be authentic." (*Id.*) Rankin argues that this testimony is conflicting such that the jury should have disregarded Imel's testimony. (*Id.*) Rankin also points to Imel's testimony at trial that he analyzed sixteen images that had been taken from a video, and that Imel noted the images had been "cropped out and resized" into the frames so they could be embedded into a sixteen-image collage, and that Imel also "admitted that cropping images is manipulation as it changes the imagery and controls what the viewer sees." (*Id.* (emphasis omitted).) Rankin argues that this therefore conflicts with Imel's previous testimony that the images had not been manipulated and were "100 percent authentic." (*Id.* at 13–14.)

The government argues that Imel's testimony was credible and consistent. (Gov't Opp'n 18.) In support, the government notes that on cross-examination, Imel explained that in his view, "100 percent authentic" and "appeared to be authentic" were "synonymous," and the jury was entitled to credit that testimony. (*Id.*) The government also contends that Imel did not contradict himself regarding the cropped images, because Imel first testified that a video was authentic and not manipulated, and then later testified that a separate image collage derived from that video included four cropped images. (*Id.*) The government also argues that Imel explained that the cropping of the four images in the collage did not affect his conclusion that the images in the collage were derived from the video. (*Id.*) Finally, the government argues that regardless, there was evidence introduced throughout trial independent of the testimony of Special Agent Tassone, Imel, and Rankin's statements that provided an ample basis for the jury to convict Rankin on all three counts of the Indictment, and notes that Imel only testified with respect to one image and one video clip of child pornography that were related to Count Three of the Indictment. (*Id.* at 19 n.4.)

On cross-examination, Imel stated that there was "no difference in [his] mind" between "100 percent authentic" and "appear[s] to be authentic." (Trial Tr. 487:6–10.) He also stated that he did not agree that "cropping was a manipulation of the image in the video." (*Id.* at 487:17–25.) Based on this evidence, a rational juror could conclude that Imel's testimony was not conflicting, that he meant the same thing when he stated something "appeared to be authentic" and was "100 percent authentic," and that the cropping of the still images from the video did not manipulate the video itself. Regardless, as discussed *supra*, even if the testimony

14

was inconsistent, the Court may not disturb the jury's credibility determinations based on inconsistencies in a witnesses' testimony. *O'Connor*, 650 F.3d at 855.[3]

### III. Conclusion

For the foregoing reasons, the Court denies Rankin's motion for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure.

Dated: September 10, 2024
      Brooklyn, New York

                                      SO ORDERED:

                                      _____s/ MKB_____
                                      MARGO K. BRODIE
                                      United States District Judge

---

[3] Rankin does not argue that if the jury properly considered the evidence discussed, there was insufficient evidence to convict him, and the Court therefore declines to consider that question.